**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

JOSHUA ALBERT HATCH,

Petitioner,

vs.

THE PEOPLE OF THE STATE OF CALIFORNIA,

Respondent.

_______________________________/

No. 2:12-CV-1561-CMK-P

MEMORANDUM OPINION AND ORDER

Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c). Pending before the court are petitioner's petition for a writ of habeas corpus (Doc. 1) and respondent's answer (Doc. 12).

/ / /

/ / /

/ / /

/ / /

## I. BACKGROUND[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Simmering tension between neighbors living in upstairs and downstairs apartments erupted into physical confrontations on three occasions. The third altercation occurred on the evening of May 30, 2009, when defendant Albert Joshua Hatch punched Dan Lopez in the head and chest. Lopez fell backward and hit his head on the ground, thereby suffering injuries that included a temporal bone skull fracture. Defendant also scuffled with others associated with the upstairs apartment.
>
> Defendant claimed he acted in self defense, but a jury convicted him of battery with serious bodily injury . . . and misdemeanor assault. . . . Defendant admitted a prior serious felony conviction. The trial court sentenced him to 11 years in state prison for the battery and prior strike conviction. The court denied probation on the misdemeanor conviction but imposed no additional jail time.
>
> On appeal, defendant contends (1) the trial court erred by excluding evidence of the fight that occurred between the upstairs and downstairs occupants a few hours prior to defendant's altercation with the victim, (2) the trial court should have instructed the jury on defense of another based on defendant's intent to protect his girlfriend's son, and (3) cumulative prejudice resulting from the claimed errors requires reversal.
>
> We conclude that evidence of the earlier confrontation between the two sets of neighbors should have been admitted, but we find the error to be harmless. We also conclude that the trial court did not err in refusing to instruct on defense of another for lack of imminent danger to the person that defendant purported to protect. Finding only a single nonprejudicial error, we reject defendant's cumulative prejudice argument. In all other respects, we affirm the judgment.
>
> FACTUAL AND PROCEDURAL HISTORY
>
> *Stipulation*
>
> At the outset of trial, the prosecution and defense stipulated: "Cindy Ronquillo rented the upstairs apartment located at 2510 27th Street . . . . [¶] . . . Karen Hendrix lived at that apartment [downstairs] with her son, Jonathon Poppy Vegas [(Poppy)]. Karen Hendrix was in a dating

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

relationship with [defendant] on May 30, 2009. [Defendant] regularly would visit Hendrix at her apartment.

"The upstairs occupants and the downstairs occupants at 2510 27th Street did not get along as of May 30, 2009. There had been several disagreements between the parties regarding noise and parking issues."

*Prosecution Evidence*

At approximately 8:00 p.m. on May 30, 2009, the two sets of neighbors arrived at their apartment complex at nearly the same time. The upstairs neighbor, Ronquillo, arrived in one car with her boyfriend, Dan Lopez. Ronquillo's brother and sister-in-law, Kirk Allen and Davida Trejo, accompanied them in another car. While Lopez was still parking the car in the apartment complex parking lot, Ronquillo noticed Poppy's car pull into the driveway "pretty fast." Defendant was the driver, and Poppy and his girlfriend, P.M., were passengers. Defendant parked next to the door of Hendrix's downstairs apartment. P.M. entered Hendrix's apartment, but Poppy lingered on the porch right in front of the entrance door.

Defendant got out of the car and started "talking crap" to Lopez. Defendant turned his focus on Ronquillo, who saw that he was "very angry" at her. Defendant and Ronquillo both launched into verbal tirades. As defendant followed Ronquillo, he repeatedly told her, "You ain't talking no shit, are you, bitch?" Defendant was "raising his voice. He was hitting himself. He tore off his shirt. He was . . . a little raging."

Lopez was scared and hurried to unlock the back door of Ronquillo's apartment. Meanwhile, defendant "was getting madder and madder," seemingly ready to hit Ronquillo. Defendant ripped off his shirt "as if he was going to fight" with Ronquillo.

Lopez headed down the stairs and stood between Ronquillo and defendant. Lopez did not have his fists clenched or appear ready to fight. He did not approach defendant in an aggressive manner. Lopez asked, "[W]hat are you going to do, Man?" Defendant responded by punching Lopez in the face. As Lopez was falling backward, defendant "hit him in the chest really hard."

Lopez hit his head on the concrete driveway and lost consciousness. Lopez convulsed on the ground. As Ronquillo tried to check on Lopez, defendant punched her in the chest and she fell backward. Allen jumped onto defendant, and they began to wrestle. Defendant yelled to Poppy for help. Ronquillo testified that Poppy was not "anywhere in this vicinity up until [defendant] yells for Poppy." Allen testified that he did not see Poppy anywhere before defendant yelled for help.

/ / /

/ / /

When Poppy emerged from the downstairs apartment, he was wielding a golf club. Poppy lost his grip on the golf club, which went flying and hit Ronquillo on the back of her arm. Poppy ran over to Allen and defendant. Allen picked up a can of paint and started swinging it at defendant and Poppy. The lid came off and pain went "everywhere." Ronquillo yelled for Trejo to call 911.

Defendant secured Allen in a headlock, and Allen bit defendant four or five times in the stomach. Poppy hit Allen in the head and kneed him in the face three times. That "really knocked [Allen] out" and he fell to the ground. Defendant and Poppy ran away.

Allen got up and wanted to leave immediately with Ronquillo. Lopez was still unconscious and convulsing. Ronquillo and Trejo refused to leave Lopez, saying that they would stay until the police arrived. Allen got in his car and drove away. After a few minutes, Allen decided to return to Ronquillo, Trejo, and Lopez. On his way back, he saw defendant standing on the sidewalk and swinging a golf club. Defendant told Allen, "I'm going to get you. I know where you work." The threat scared Allen.

When a police helicopter arrived, defendant and Poppy left the scene. Lopez regained consciousness and began vomiting. He was transported to the hospital for treatment. Lopez suffered a temporal skull fracture and other injuries consistent with blunt force trauma. His treating physician considered the injuries sufficiently serious to admit Lopez into the intensive care unit.

Allen suffered chipped teeth, and his teeth were knocked so out of alignment that he could chew only soft fruit for a month. Allen also sustained bruises on his head, knee, legs, chin, and elbow. An officer who arrived on the scene observed blood coming from Allen's mouth.

*Defense Evidence*

Hendrix testified foe the defense and related an incident that occurred approximately two weeks before May 30, 2009. Lopez came to the downstairs apartment and began yelling. Hendrix went outside with defendant and Poppy. Lopez yelled at them that he was going to smash Poppy's car with his car. Lopez continued "[t]hat he'd fight anybody out here. He didn't care who he had to fight. He would kick anybody's ass. And he was just ranting and raving." During his tirade, Lopez took off his jacket. Lopez and defendant "squared up like they were going to fight," but Hendrix jumped in the middle and separated them. Defendant told Lopez, "[Y]ou guys, this is enough. This is – you know, this is uncalled for." Hendrix, Poppy, and defendant went back inside their apartment.

Hendrix was not present during the altercation between the upstairs and downstairs neighbors on the evening of May 30, 2009.

/ / /

Testifying on his own behalf, defendant was questioned about the altercation two weeks prior to May 30, 2009, when Lopez came to the downstairs apartment about the parking issue. Defendant recounted that Lopez and Poppy got into a shouting match. Hendrix attempted to get in between Lopez and Poppy. Defendant did not know whether Lopez was going to hit Hendrix, so he "got in between them and broke it up." In doing so, defendant punched Lopez once because he "had to, like, separate them." The record does not indicate that Lopez hit back.

Lopez told defendant that he "can get it, too." Defendant understood this to mean that Lopez could "call somebody over." Defense counsel then questioned defendant as follows:

"Q. . . . [Y]ou are quite a bit bigger than [] Lopez. [¶] Right?

"A. Yes, Ma'am.

"Q. Would it [be] fair to say that that was the reason why you weren't scared of him?

"A. Yes."

Defendant considered the encounter "[j]ust a shouting match," and thought Lopez "wasn't really no threat."

On the evening of May 30, 2009, defendant was hanging out with Hendrix, Poppy, and P.M. at the house belonging to Hendrix's brother. Defendant decided to accompany Poppy and P.M. back to Hendrix's apartment where Poppy and P.M. planned to retrieve some clothing. Poppy drove his car and cautiously pulled into the driveway because Ronquillo and others were in the parking lot. Defendant was "[k]ind of like worried a little that something might happen" but did not intend to fight anyone because he was with "those two kids." At the time, Poppy was 16 years old and P.M. was 14 years old.

After they parked, defendant got out of the car and took off his flannel work shirt. Defendant still had a white tank top on underneath his work shirt. Ronquillo and Lopez walked beside Poppy and P.M., with defendant following them. Ronquillo called Poppy a "punk ass." Poppy was going to stop, but defendant urged him to keep walking to the apartment. Defendant told Ronquillo to "leave it alone," and Lopez "started to go off" on defendant. Ronquillo then directed a string of invective against defendant. Defendant felt frustrated and "cussed back." Poppy stopped walking and turned toward them. Poppy did not enter the downstairs apartment.

Lopez walked up the stairs to unlock the upstairs apartment. Defendant argued with Ronquillo and called her a "Fat Bitch." Defendant was mad. Poppy was "off to, like, the left of" defendant near the "porch-door area."

> Lopez came down the stairs, his face red and his fists balled at his side. Walking very fast, Lopez came over to defendant and Ronquillo. Defendant said, "Don't walk up on me." Defendant stuck out his hand and said, "Dude, don't even try." Lopez paused, then lunged toward defendant. Lopez was in a fighting stance with his fists up. As Lopez cocked his right hand to throw a punch, defendant hit him "pretty hard" in the jaw area. Defendant struck Lopez because he thought Lopez and Allen "were going to try to jump me."
>
> Ronquillo then hit defendant in the face and on the back of his head. Defendant was unable to hit her back because Allen was already on top of him. Allen bit defendant in the neck and on his stomach. Trejo joined in by hitting defendant repeatedly. Defendant called to Poppy for help in getting Allen off of him. Poppy ran over and kicked Allen. Everyone let go of defendant. Allen picked up a paint can and tried to hit defendant with it. Poppy grabbed Allen in a "bear hug," and tried to throw him to the ground. The paint can opened and spilled on the ground.
>
> Poppy and defendant began to walk away quickly. Allen pulled out a knife or box cutter and stabbed defendant in the side. Defendant swatted Allen's arm away, and prevented the wound from being very deep. Defendant ran into the downstairs apartment and grabbed an aluminum bat to defend himself. Allen ran away. Poppy grabbed some clothes and his phone charger, and Poppy, P.M., and defendant left the apartment. On the way out, defendant retrieved his flannel shirt from where it was hanging on a wooden banister.

## II. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA does not, however, apply in all circumstances. When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208

(9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner). When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412) . "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice

created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court

decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## III. DISCUSSION

Raising the same three claims presented in state court, petitioner argues: (1) the trial court erred by excluding evidence; (2) the trial court misinstructed the jury on self defense and erred by failing to instruct the jury on defense of another; and (3) the cumulative effect of these errors rendered the trial unfair.

### A. Evidentiary Rulings

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state issues de novo. See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941). Because federal habeas relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994). To raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960). In any event, an

evidentiary error is considered harmless if it did not have a substantial and injurious effect in determining the jury's verdict.

Regarding petitioner's exclusion-of-evidence claims, the state court held as follows:

> Defendant contends the trial court erroneously excluded evidence regarding a fight between the upstairs and downstairs neighbors that occurred a few hours before the altercation on the evening of May 30, 2009. Defendant argues that the excluded evidence concerned a physical confrontation involving Lopez that explained why defendant wanted to accompany Poppy and P.M. back to the apartment to retrieve their clothes. The excluded evidence, defendant claims, also was relevant insofar as it affected his state of mind when he encountered Ronquillo, Lopez, and others associated in the upstairs apartment. Defendant also assigns error to the trial court's exclusion of evidence regarding Ronquillo's brandishing of a gun after defendant's fight with Lopez and wrestling with Allen.
>
> We agree that the trial court should have allowed the defense to introduce evidence of the earlier fight but conclude that the error was harmless. We reject defendant's argument that the trial court erred in excluding evidence that Ronquillo brandished a firearm.

1. <u>Evidence that Ronquillo Brandished a Gun</u>

The state appellate court described the proffered evidence in more detail as follows:

> The court also excluded evidence that "[a]t some point, [Ronquillo] goes up and grabs a gun and comes downstairs, and she's waiving [sic] it around." Defense counsel sought to introduce the evidence based on the expectation that the "[p]rosecution is going to request the defendant's flight instruction. . . . Knowing that somebody has got a gun there would definitely have an impact as to why they left the scene." . . .

The trial court excluded the evidence as irrelevant because Ronquillo allegedly brandished the gun after the events in question. As to this evidence, the state appellate court held:

> . . .[T]he trial court did not err in excluding evidence that Ronquillo brandished a gun after the defendant fought with Lopez and others associated with the upstairs apartment. The prosecution did not request a consciousness of flight instruction, and defendant's reason for leaving the scene of the fight had no relevance to whether he acted in self defense or as the initial aggressor. That Ronquillo displayed a firearm after the fight did not inform whether defendant believed that he had been

> in imminent danger when he hit Lopez. Accordingly, the trial court did not err in excluding evidence that Ronquillo went upstairs to retrieve a gun after defendant fought with Lopez and others.

The court finds no error, let alone one resulting in a complete miscarriage of justice, given that the proffered evidence related to something that allegedly happened after the events giving rise to the charges against petitioner. The state court's denial of this clam was neither contrary to nor based on an unreasonable application of federal law.

2. Evidence of an Earlier Fight

As to evidence of an earlier fight, the state court concluded that any error was harmless:

> Our conclusion that the evidence of the early afternoon fight should have been admitted compels reversal of the judgment only if the error was prejudicial. . . .
>
> * * *
>
> . . .We conclude the error was harmless. Evidence of the early afternoon fight would have added little to the testimony that the jury did hear. The jury heard that Lopez had previously threatened defendant and sought to fight during the incident that occurred two weeks before May 30, 2009. The court also informed the jury about the stipulation by the parties that the upstairs and downstairs neighbors did not get along and had ongoing disagreements. The proffered evidence did not involve any further threat by Lopez against defendant. Instead, it showed that Lopez received blows by Hendirx's brother but did not hit back. Moreover, the early afternoon incident did not negate defendant's testimony that he had not been afraid of Lopez or his threats two weeks earlier because defendant was bigger than Lopez. Although relevant, the proffered evidence would not have sufficed to overcome the jury's conclusion that defendant was the aggressor in his confrontation with Lopez on the evening of May 30, 2009.

Assuming that the trial court erred in excluding the proffered evidence, and applying the harmless error standard applicable on collateral review of claims of federal constitutional error, the court agrees that any error was harmless. In habeas cases, the standard applied in Kotteakos v. United States, 328 U.S. 750 (1946), governs harmless error analysis. See Brecht v. Abrahamson, 507 U.S. 916, 637 (1993). Under this standard, relief is available where error occurs only where such error "had a substantial and injurious effect or influence in

determining the jury's verdict." Kotteakos, 328 U.S. at 776; see also Padilla v. Terhune, 309 F.3d 614, 621 (9th Cir. 2002); Laboa v. Calderon, 224 F.3d 972, 976 (9th Cir. 2001).

Here, the proffered evidence of an earlier fight would have been cumulative of other evidence the jury heard that Lopez had threatened petitioner, that the upstairs and downstairs neighbors did not get along and had ongoing disagreements, and that petitioner was not afraid of Lopez. Given that the jury was presented with evidence which would have allowed it to reach the conclusions petitioner suggests the proffered evidence would have allowed, exclusion of the evidence could not have had a substantial and injurious effect on the verdict. The state court's denial of this claim was neither contrary to nor based on an unreasonable application of federal law.

**B. Jury Instructions**

In general, to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)). To prevail, petitioner must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147). In making its determination, this court must evaluate an allegedly ambiguous jury instruction "'in the context of the overall charge to the jury as a component of the entire trial process.'" Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)). Further, in reviewing an allegedly ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)). Petitioner's burden is "especially heavy" when the court fails to give an instruction. Henderson v. Kibbe, 431 U.S. 145, 155 (1977). Where an instruction is missing a necessary element completely, the "reasonable likelihood" standard does not apply and the court

may not ". . . assume that the jurors inferred the missing element from their general experience or from other instructions. . . ." See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994). In the case of an instruction which omits a necessary element, constitutional error has occurred. See id.

Regarding petitioner's jury instruction claim, the state court held:

> Defendant next contends the trial court erred by failing to instruct sua sponte on defense of another. Specifically, defendant argues that the court should have instructed the jury that defendant was entitled to acquittal if it found that he acted to protect Poppy from harm by the upstairs neighbors. We disagree.
>
> * * *
>
> In this case, the evidence adduced at trial did not warrant the giving of an instruction on defense of another. No testimony indicated that defendant hit Lopez because Poppy was in imminent danger of being assaulted by Lopez or anyone else associated with the upstairs apartment. To the contrary, the testimony established that Poppy was not near Lopez or Ronquillo when defendant hit Lopez. At most, the evidence showed Poppy was at the doorstep to the downstairs apartment, some distance away from the confrontation in the parking lot. That Poppy was removed from the fray is demonstrated by the fact that defendant had to call him to come over when defendant cried for help. When defendant instigated the fight, Poppy was not in any "immediate and present" peril that appeared to require "instant reaction." (Citation to state law omitted). Accordingly, the trial court properly rejected defense counsel's request to instruct on defense of another.

The court agrees with respondent that federal habeas relief is unavailable on this claim. The state court held that a defense-of-another instruction was not warranted because there had been no evidence adduced at trial to meet the state law elements of that defense – immediate and present peril requiring an instant reaction. Under California law, defense of another requires evidence of an actual and reasonable belief in the need to defend the threatened person against an imminent danger of bodily injury. See People v. Randle, 35 Cal.4th 987, 994 (2005). A mere fear that danger will become imminent is insufficient. See People v. Aris, 215 Cal.App.3d 1178, 1188 (1989). The peril must have existed at the very time the defendant acted. See Id. at 1187. Because the issue involves interpretation of the trial court's application of state law, federal habeas relief is not available on this claim. See Middleton, 768 F.2d at 1085.

**C. Cumulative Error**

Petitioner's claim of cumulative error lacks merit because, as discussed above, there are no errors to aggregate.

**IV. CONCLUSION**

Pursuant to Rule 11(a) of the Federal Rules Governing Section 2254 Cases, the court has considered whether to issue a certificate of appealability. Before petitioner can appeal this decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). Where the petition is denied on the merits, a certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue. See Fed. R. App. P. 22(b). Where the petition is dismissed on procedural grounds, a certificate of appealability "should issue if the prisoner can show: (1) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling'; and (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'" Morris v. Woodford, 229 F.3d 775, 780 (9th Cir. 2000) (quoting Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595, 1604 (2000)). For the reasons set forth above, the court finds that issuance of a certificate of appealability is not warranted in this case.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Accordingly, IT IS HEREBY ORDERED that:

1. Petitioner's petition for a writ of habeas corpus (Doc. 1) is denied;

2. The court declines to issue a certificate of appealability; and

3. The Clerk of the Court is directed to enter judgment and close this file.

DATED: September 30, 2015

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE